## MONTANA COAL & COKE CO. v. KOVEC.

(Circuit Court of Appeals, Ninth Circuit. February 7, 1910.)

### No. 1,705.

1. Master and Servant (§ 288*)—Master's Liability for Injury to Servant—Assumption of Risk.

A coal miner, directed by his employer to operate an engine about which he had no knowledge or experience and was given no instruction, cannot be held as matter of law to have assumed the risk.

[Ed. Note.—For other cases, see Master and Servant, Cent. Dig. §§ 1068–1088; Dec. Dig. § 288.*

Assumption of risk incident to employment, see note to Chesapeake & O. R. Co. v. Hennessey, 38 C. C. A. 314.]

---

*For other cases see same topic & § number in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

2. MASTER AND SERVANT (§§ 153, 288, 289*)—MASTER'S LIABILITY FOR INJURY TO
    SERVANT—ACTION—QUESTIONS FOR JURY.
        Plaintiff, who was a coal miner employed by defendant in its mine, was
    directed by his superior to go and operate an electrical engine used to draw
    cars up an incline. There was gearing on either side of the place where he
    stood in operating the engine, within one or two feet, wholly unguarded,
    and he was required to keep his foot on a brake which vibrated with the
    action of the engine. His foot slipped from the brake, and he fell against
    the gearing and was injured. He had no experience in running the engine,
    and was given no instruction. *Held*, that defendant was chargeable with
    breach of duty in setting him at such work without instruction, and that,
    while the gearing could be seen and the danger therefrom was apparent
    if a person fell into it, the questions of assumption of risk and contribu-
    tory negligence were properly submitted to the jury.
        [Ed. Note.—For other cases, see Master and Servant, Cent. Dig. §§ 314–
    317, 1068–1132; Dec. Dig. §§ 153, 288, 289.*]

In Error to the Circuit Court of the United States for the District
of Montana.

Action by Andrew Kovec against the Montana Coal & Coke Com-
pany. Judgment for plaintiff, and defendant brings error. Affirmed.

Carpenter, Day & Carpenter, for plaintiff in error.

Thomas J. Walsh and Cornelius B. Nolan, for defendant in error.

Before GILBERT, ROSS, and MORROW, Circuit Judges.

ROSS, Circuit Judge. The defendant in error sued and recovered a
verdict and judgment for damages in the court below against the plain-
tiff in error for injuries sustained by him under circumstances herein-
after indicated. The case shows that he was in the employ of the
company for several years as an ordinary coal miner, and was so work-
ing on the day of the accident to him. There was testimony going to
show that the mine was a deep and extensive one, and that in the work-
ing of it cars of coal were drawn up various slants to the main track
by means of engines operated by electricity. At other places they were
drawn by mules.

William England testified, on behalf of the plaintiff, that he was
employed by the company at the time the plaintiff was injured; that
as the operations were carried on it was necessary that somebody
should always be with the cars while they were moving, and also some
one to operate the engines; that the engine by which the plaintiff was
injured was at the second slant, as it was then called, some distance be-
low the surface of the ground. Being asked whether there is a "driver
for every engine there is in the mine," the witness answered:

"A. Well, there is a regular engineer for some of them, and in some places
where there is not so much to do the driver does it. Q. That is, there is an
engineer in some places where there is a lot of work to be done with the en-
gine? A. Yes, sir. Q. And in places where there is not so much work, you say,
it is done by a driver? A. Yes, sir; if there is one there. Q. Did you ever know
of the work being done there by anybody else other than the driver or an engi-
neer? A. I don't know. I think they did on night shifts. Sometimes there was
a driver and sometimes there wasn't. Q. Of course, if there was not a driver
there, and if there was not an engineer there, and it became necessary to oper-
ate the engine, it would have to be operated by whom? A. By the fellows who
were working there. Q. Do you know whether they were engineers or not? A.

No, sir; I don't. Q. You were not an engineer, were you? A. I wasn't altogether one. I have had some experience with them. Q. You have had some experience? A. I have run them lots of times. Q. Do you think that it requires any experience to operate one of those engines? A. You have got to be shown how to run it all right. Q. What do you say? A. You have got to be shown how to run it. I know I did. Q. Now, were you the driver in this particular slant, where this particular engine was operated? A. There was two drivers there. There was one driver off that day: but I was supposed to be there that day, I guess. The other driver was out hunting. Q. The other driver was out hunting? A. Yes, sir. Q. Did you yourself have occasion to use that engine that day before the accident? A. Yes, sir. Q. About how many times? A. Either four or five times. I don't remember exactly. About four times, I guess. * * * Q. When you were operating the engine there, to what matters did you have to give attention? A. Well, you fixed the engine first, and then you had to give attention to the cars when they were coming up. Q. Did you have to use your hands at all? A. Yes, sir; you had to use one on the clutch, and one on the lever. Q. Did you have to use your feet? A. Yes, sir; one foot for the brake. Q. Did you have to use your eyes? A. Yes, sir. Q. What would you be using your eyes upon? A. Watching the cars. Q. Now, going to the brake itself, as it was there that morning, will you tell us its location? A. It was underneath. You had your foot down on it like that (illustrating). It was underneath. Q. Underneath? A. Yes, sir. Q. Do you know whether there were any timbers near it? A. Yes, sir; I do. Q. What character of timbers were they? A. I don't know what you would call them. They were big 2x4's like. About that wide (indicating), I guess; about 12 inches, I guess. Q. In operating the engine, where were you standing with reference to where the brake was, and with reference to the space caused by those timbers? A. Standing right in them. There was one across there, and one in back there, and one along the sides like that (illustrating). Q. So that you were in a kind of a box, were you? A. I was standing right here (illustrating). Q. As to the brake itself, what kind of a piece of mechanism was it? A. It was a piece about that wide (indicating), I guess; and it ran out that way (indicating). I never looked at it much. Q. Was it wider than the sole of a man's shoe? A. Not much wider, if it was any. Just about the size, I guess, of a man's shoe; about the size of your shoe. Q. Do you know whether or not it was perfectly still there that morning? A. No; it kept shaking when the trip was coming up—when it was pulling on the engine. Q. It kept shaking? A. Yes, sir. Q. Did you see any gearing there? A. Yes, sir. Q. Where was the gearing, with reference to where you were standing? A. Right on the side; on the lefthand side. Q. Could you tell us whether that treadle or that brake was so constructed there, or was of such a character, that you miss it or slip on it? A. Well, I guess if you would slip on it, you would be liable to fall. Q. If you did fall, where would you fall with reference to the gearing? A. You would fall into them, I guess. There is two of them there—either on the right side or left side. Q. What would you say as to whether or not, in your judgment, that gearing, as it was there, was reasonably safe? A. It was not, if you would fall. It was safe, if you were standing up. Q. There is no doubt about that. But, in the light of the fact that you might fall, what would you say as to whether or not, in its exposed condition there, it was reasonably safe? A. No, sir; it was not. Q. About how far away was the gearing from the man who stood there operating the machine? A. It would be about like this (illustrating). Q. About a foot or two away from him? A. Yes, sir."

There was testimony tending to show that on the day of the plaintiff's injury he was working in the mine at his regular employment as a common miner, when he was told by the boss having supervision of him to run the engine concerning which England was questioned; that the plaintiff knew nothing about machinery, and was not given any instructions in respect to the operation of the engine, nor told of the dangers attending the running of it; that shortly after he undertook its operation his foot slipped from the brake, thereby throwing him on

to the cogwheels, which were unguarded, and which resulted in the loss of one of his hands.

The sole point made on behalf of the plaintiff in error is that the court below erred in refusing to grant a motion made by it for a non-suit, and likewise erred in refusing, upon the conclusion of all the testimony, to grant a motion made on its behalf for an instruction to the jury to render a verdict for the defendant. In submitting the case to the jury, the trial court did so in instructions so fair and clear that no exception thereto was taken by either party to the action. We therefore have to deal only with the refusal of the court to take the case from the jury, to which action the defendant reserved an exception, and, in support of its assignment of error in that behalf, contends that it appeared from the evidence, first, that the plaintiff was not compelled to operate the engine; second, that the danger from operating it with an exposed cogwheel was obvious to the plaintiff, and that he therefore assumed the risk of operating the engine with that danger in view; and, third, that putting his foot on the brake as he did was contributory negligence on his part.

The contention that the plaintiff was a volunteer in the work which resulted in his injury, in view of his testimony that he was afraid to disobey the order of the boss lest he might lose his job, is wholly without merit. So, too, is the contention that the plaintiff assumed the risk that resulted in his injury. The plaintiff undoubtedly assumed the risk incident to the work for which he was employed, namely, that of a common miner; but when he was, by the defendant's direction, taken from that work and ordered to operate machinery, about which he knew nothing and was told nothing, surely a trial court should not be held to have erred in submitting to the jury, under correct instructions, the question of the assumption of risk upon all the facts and circumstances of the case, especially where, as in the instant case, there was testimony tending to show that the brake from which the plaintiff's foot slipped, thereby causing his fall and injury, vibrated more or less violently when the engine was put in motion, which danger could not be obvious to one not familiar with such machinery when it was not in operation.

In the case of Mountain Copper Company v. Pierce, 136 Fed. 150, 69 C. C. A. 148, where an inexperienced servant was directed by the defendant smelting company to adjust a belt on a pulley shaft, without instructing him with reference to a collar and set screws projecting from a shaft, by which he was caught and seriously injured while endeavoring to adjust the pulley, we said:

"He [the plaintiff] testified that he knew nothing about the collar or set screws, and that neither the foreman, nor Ryan, nor any one else, told him of their existence, nor the danger attending the operation, or how to perform it. While it is contended on the part of the plaintiff in error that both the collar and set screws could have been seen by the defendant in error if he had properly looked, it is not contended that he was told of their existence, or of the danger attending the operation or how to perform it. True it is that the defendant in error knew that it is dangerous to approach shafting, belting, or other machinery in motion. That fact not only appeared from his own testimony, but is a matter of such common knowledge that every one in his senses must be held to know it. Nevertheless it is the duty of the master, before sending or permitting an inexperienced employé to perform such dangerous work, to instruct him how to perform it, and especially to inform him of any

hidden, concealed, or obscure danger. * * * The law in our opinion made it the duty of the plaintiff in error to inform the defendant in error of the collar and set screws, and how to perform the dangerous task, before sending or permitting him, in the course of his employment, to undertake it."

The defense of contributory negligence, interposed by the defendant to the action, was also properly submitted to the jury under proper instructions.

The judgment is affirmed.