SMITH v. COOK et al.

(District Court, E. D. Pennsylvania.   October 30, 1908.)

No. 67.

SEAMEN (§ 29*)—PERSONAL INJURIES—ASSUMED RISK.

Libelant, who was 17 years old and employed as mess boy on a steamer then lying at a dock, was called from his berth in the early morning by the boatswain and ordered to assist others in paying out a line attached to a pile while the vessel was being moved to another berth. While so engaged the line slipped from the drum on which it was wound, and libelant's foot was caught in a coil, and his leg torn off. Such work was not in the line of his employment, and it did not appear that he was familiar with the danger. *Held*, that he did not assume the risk therefrom, and that the vessel was liable for his injury; it not appearing that he was negligent.

[Ed. Note.—For other cases, see Seamen, Dec. Dig. § 29.*]

In Admiralty. On final hearing.

John M. Patterson and Cornelius Haggarty, Jr., for libelant.
John F. Lewis and Francis C. Adler, for respondents.

HOLLAND, District Judge. On August 15, 1902, Robert Smith, the claimant, was working as mess boy on the steamship John J. Hill, and on that date received a personal injury by having his leg caught in a hawser and torn completely off below the knee. The vessel was moored along the Allegheny Avenue Wharf, in the Delaware river, in this district. Smith brought an action in trespass in the court of common pleas of the county of Philadelphia against Arthur G. Cummer, Waldo E. Cummer, and Henry W. Cook, owners of the steamship, to recover damages for his injury. The summons in the state court was served only upon Cook, who thereupon presented his petition to this court to have the action removed and his liability limited as provided by law, reserving the right to contest any liability whatever for the injury to Smith in this court, to which the case has been removed, and he is entitled to make this contest for the purpose of ascertaining whether or not Smith is entitled to recover anything

against him. As a result of the proceedings for a limitation of liability, Mr. Cook filed a stipulation in the sum of $8,000, being the appraised value of his interest in the steamship.

Robert Smith, on the day of the accident, at about 5:30 o'clock a. m., was helping two other men to pay out a line fastened to a windlass in the bow through a starboard mooring chock to a piling on the wharf. The vessel was being towed out of the dock, and Smith, with the others, was steadying her bow with this line, as is customary, and in doing this work in some way the line slipped off the drum of the windlass, caught Smith's leg in a coil, and drew him to the mooring chock, where his leg was pulled off below the knee and fell into the water. There is no dispute as to these facts. The only question is whether or not the owners of the steamship are in any way responsible for the injury received by this young man. As usual, in these cases, the evidence is conflicting and most of it unreliable, rendering it extremely difficult to ascertain which is in the right. It is claimed for libelant that he was but 17 years of age, and employed on the vessel as mess boy, and that on this morning, the most of the crew having been discharged in the home port and the vessel being short-handed, he was called out of bed by the boatswain to help take in the lines to move the boat to the loading pier, and the responsibility of the owners lay in the fact that he was ordered to perform duties that were not within the scope of his employment and of the nature and danger of which he was ignorant; while the owners contend that Smith went to the aid of Kelly in handling the bow rope of his own free will and without any request or command on the part of his superiors on the vessel, and that he was guilty of the grossest negligence in standing on the coil of rope being paid out.

The story of Smith is that he was asleep in his bunk, and at about 5:30 a. m. he was awakened by the boatswain calling him on deck "to give a hand." Smith objected upon the ground "it was not his work," but was again shortly thereafter called by the boatswain, and was told by the steward to "go up and see what he wants"; and Smith "slipped on his pants and shirt and went on deck," and the boatswain "in a threatening manner" ordered him to return and dress properly and come on deck, which he did, and was then sent forward to find "Jack Kelly" and "give him a hand." Kelly and a stevedore were steadying the bow of the vessel, which was being towed out into the stream by paying out this hawser gradually from a windlass through the mooring chock as the boat receded. Smith took hold of the rope in front of Kelly, and about that time it slipped off of the drum of the windlass, and Smith, in an endeavor to re-coil the hawser on the drum at the suggestion of Kelly, was caught in the rope which was being paid out. He had stepped on the rope, but was entirely unaware of any danger that might result from so doing. This story is corroborated by the boatswain; but the latter's evidence is discredited by the fact that he had previously sworn to a statement in accord with the story told by some of the witnesses for the defendant, and while under examination denied that he had given such a statement, and shortly afterwards acknowledged he had sworn falsely, and gave as an excuse he did not remember he had written a statement, and, as

to the other, that he swore to it because he was afraid he would lose his job if he refused.

The defense is that Smith was anxious to be a sailor man and that he voluntarily did this work, and, after being awakened and appearing on deck without being fully dressed, he was told that his services were not needed, but that because of his anxiety to learn the work of a sailor he went below, dressed himself properly, and returned, and of his own notion went forward and helped Kelly in the work he was doing in steadying the vessel. The captain stated that he had directed the boatswain to request the steward to help in taking in the lines, and that he (the steward) did not appear with the mess boy for more than 20 minutes after the work had begun, and that he (the captain) then told the steward that he did not require him or the mess boy, as the work was nearly done. The evidence of the steward is to the effect that he and the mess boy were called by the boatswain to help in taking in the lines, but that the steward did not come on deck at all, but went on making his fire after he had been awakened, and that the mess boy went on deck, and returned shortly thereafter, and stated to the witness that he was not wanted, as the work was all done, and that he (the witness) was not on deck until after the accident had occurred. This is the evidence for the defense to show that the libelant volunteered to do this work and in doing it stepped upon the coil of rope which was being paid out, and in so doing was so grossly negligent that he cannot recover.

It will be noted that the story of the captain and that of the steward is entirely different, although both are offered for the purpose of showing that the mess boy was not ordered to do this work, and they tend to establish that fact; but it seems to me improbable that a boy 17 years of age would voluntarily, after being awakened out of a sound sleep so early in the morning on a summer's day, offer to do work which was not in the line of his duty, and especially so if told that he was not needed to aid in its performance. Yet to believe the evidence produced on the part of the defense it is necessary to find that this boy, after being awakened out of a sound sleep with some trouble and urging on the part of the steward and having gone on deck, was told his services were not needed, that he would take off his boots that he was said to have worn by the steward, put on his shoes, return to the deck, and go forward without being ordered, to help two men pay out a line over a windlass, when the boatswain was working aft alone. The truth seems to be that the captain, through the boatswain, ordered both the steward and the mess boy to go on deck and help take in the lines, and when the boy appeared, improperly clothed, he was ordered to dress, return on deck, go forward, and help Kelly. He had only been on the vessel a month. There is evidently considerable danger in handling a rope under such circumstances as appear in this case. The boy evidently did not know the danger of stepping upon the pile of coiled rope in his effort to place the hawser on the windlass, and I am unable to find that he voluntarily did the work, or that he was guilty of negligence in failing to avoid the coiled rope.

The fault charged upon the respondent is that the libelant was "ordered and compelled to perform the duty that was not within the scope of his employment and of the nature and danger of which he was ignorant." The fact that the work was nearly completed at the time the boy arrived upon deck the second time, and that he may not have been needed in the work of taking in the lines and steadying the bow of the vessel as she was being towed out, is immaterial. If he had been directed by the boatswain to do this work, which was "not within the scope of his employment and of the nature and danger of which he was ignorant," he did not perform it voluntarily, and it is entirely likely that, with his youth and inexperience, he was ignorant of the danger which beset the work he was about to perform. The case rather falls within that line of decisions which hold that, where a young or inexperienced servant is injured while acting in obedience to the commands of the master, he will not be held to have assumed the risk involved in so doing, even though he may see that the work is dangerous and the machinery furnished by the master of the vessel is defective. A seaman aboard a ship must obey orders. The command of the master and prompt obedience of the seamen and all aboard are frequently so important that the very safety of the vessel depends upon it. Dangers of navigation, resulting from storms and various other difficulties which are incident to water transportation and travel, make it necessary that all on board the ship should promptly obey the commands of their superiors, and the law is that, even if the captain be in the wrong, the seamen must, as a general rule, obey his orders at sea and wait for redress until the vessel returns to port. This rule, however, cannot be so strictly enforced while the vessel is moored at a dock, where no danger can come to her. Yet even then it is the duty of the crew to obey its superiors in all reasonable commands in connection with their work upon the vessel; but where, as in this case, a young man has been directed to perform work admittedly not within the scope of his employment, those in authority directing him to perform the work are required to know that he is acquainted with any danger in connection with its performance. In this case it is not apparent that Smith knew the dangers surrounding him in the work he was directed to perform.

For these reasons, we hold that the vessel is liable, and a decree will be entered accordingly.